UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

04 10739 PBS

MAGISTRATE JUDGE Cohen

| | |
|---|---|
| THE GUARDIAN LIFE INSURANCE COMPANY OF AMERICA<br><br>On behalf of themselves and all others similarly situated,<br><br>v.<br><br>PFIZER INC. and PARKE-DAVIS, a division of Warner-Lambert Company 235 East 42nd Street New York, New York 10017<br><br>Defendants. | Civil Action No. _____<br><br>RECEIPT # _____<br>AMOUNT $ 150<br>SUMMONS ISSUED yes<br>LOCAL RULE 4.1 ____<br>WAIVER FORM ____<br>MCF ISSUED ____<br>BY DPTY. CLK. JDM<br>DATE 4-13-04 |

**CLASS ACTION COMPLAINT**

1. Plaintiff, The Guardian Life Insurance Company of America, brings this class action against defendants Pfizer, Inc., Warner-Lambert Company and Parke-Davis, a division of the Warner-Lambert Company (collectively "Defendants"). The facts and information averred herein are based upon Plaintiff's personal knowledge and beliefs, and upon investigation of counsel and the *qui tam* action brought by Relator David Franklin, a former employee of Parke-Davis. Plaintiff believes further substantial evidentiary support of the allegations herein will exist after a reasonable opportunity for further investigation and discovery. In support of this Class Action complaint (the "Complaint") against Defendants, Plaintiff alleges the following:

## I. NATURE OF THE CASE

2. This civil action is brought by a group of healthcare third-party payors on behalf of two national classes of health insurers and other purchasers of Neurontin® ("Neurontin"), an epilepsy drug that reportedly earned Defendants over $2.7 billion in worldwide sales in 2003.

3. From 1994 through at least 1998, Defendants created and implemented a fraudulent marketing and sales scheme in order to substantially increase the sales of Neurontin and reap unlawful profits at the expense of healthcare insurers, physicians, consumers and others. Defendants systematically, between themselves and with other entities and individuals, created a pervasive, illegal system to cause individual patients and their insurers to pay for Neurontin to treat a variety of symptoms for which Neurontin had not received approval from the United States Food and Drug Administration (the "FDA"), and for which the drug was not safe or medically efficacious. Defendants knew there was no scientific basis to support such uses. Defendants' scheme targeted health insurers, patients and others, and was for the specific purpose of increasing the market for Neurontin and Defendants' revenue at the expense of the Plaintiffs and the Classes.

4. Defendants' improper marketing and sales practices included, *inter alia*: (a) deliberately misrepresenting the safety and medical efficacy of Neurontin for a variety of uses not approved by the FDA, called "off-label" uses; (b) knowingly misrepresenting the existence and findings of scientific data, studies, reports and clinical trials concerning the safety and medical efficacy of Neurontin for a variety of off-label uses; (c) deliberately misrepresenting the credentials and qualifications of certain of Defendants' employees as specialists, medical researchers, physicians and scientific employees in order to market and sell Neurontin for

2

various off-label uses; (d) wrongfully interfering with the physician-patient relationship by compensating physicians for prescribing Neurontin for off-label uses; (e) purposefully instructing and coaching doctors and pharmacists how to conceal and misrepresent the use of Neurontin for off-label uses on claim forms submitted to third-party payors; (f) causing doctors and pharmacists to submit claim forms to Plaintiffs containing misinformation regarding Neurontin; (g) knowingly publishing articles, studies and reports misrepresenting the scientific credibility of data and touting the medical efficacy of Neurontin for off-label uses; and (h) intentionally misrepresenting and concealing Defendants' role and participation in the creation and sponsorship of a variety of articles and publications aimed to sell Neurontin to off-label markets.

5.  Defendants' scheme caused Plaintiffs and the Classes to pay for claims for Neurontin to treat a variety of off-label conditions when Neurontin was not safe or medically effective for the treatment of such conditions. As a result, Defendants substantially increased their sales and market of Neurontin based on misrepresentations, concealment and false scientific data.

6.  Defendants' strategy brought them skyrocketing financial returns. In 1997, Parke-Davis' worldwide revenues from Neurontin sales totaled $292 million; by 1999, sales increased to $913 million; by 2000, sales increased to over $1 billion; and in 2002, worldwide sales of Neurontin reached $2 billion. In 1996, 50% of Neurontin's sales were attributable to off-label uses, and in 2000, more than 78% of the Neurontin prescriptions written were for off-label uses. Sales of the drug are growing at a rate of 50% per year, fueled primarily by off-label uses.

## II. JURISDICTION AND VENUE

7. Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States and pursuant to 18 U.S.C. § 1964(c), because this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").

8. The Court has supplemental jurisdiction over the claims for tortious interference with the physician-patient relationship, common law fraud, unjust enrichment and violation of the consumer protection statutes of the fifty states.

9. Venue is proper in this jurisdiction under 28 U.S.C. § 1391 and 18 U.S.C. § 1965 and because during the Class Periods one or more of the Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of the events giving rise to Plaintiffs' claims occurred and a substantial portion of the affected interstate trade and commerce has been carried out in this district.

## III. PARTIES

10. Plaintiff The Guardian Life Insurance Company of America ("Guardian") is a mutual life insurance company organized and existing under the laws of the state of New York. Guardian's health insurance policies only cover claims for drugs which are approved for treatment of the covered person's sickness or injury by the FDA, and not for off-label uses. In addition, Guardian only pays pharmaceutical claims to treat conditions for which the drug is medically necessary. A drug that is not safe and medically efficacious for the treatment of a particular condition is not covered by Guardian's health insurance policy because it is not medically necessary for that condition. Accordingly, Guardian is a named representative and

5

member of Class 1 and Class 2 as defined below.

11.     Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with its principal place of business at 235 East 42nd Street, New York, New York. Pfizer is principally engaged in the manufacture and sale of pharmaceuticals and is one of the largest pharmaceutical companies in the United States, whether measured by number of prescriptions written, revenues or market capitalization.

12.     Defendant Warner-Lambert Company ("Warner-Lambert") was acquired in June 2000 by Pfizer. This acquisition included Warner-Lambert's Parke-Davis division. Prior to the acquisition, Warner-Lambert was a Delaware corporation that maintained its principal place of business at 201 Gabor Road, Morris Plains, New Jersey. In 1993, Warner-Lambert received FDA approval to market Neurontin in the United States and did so through its Parke-Davis division. Warner-Lambert is presently a wholly-owned subsidiary of Pfizer.

## IV. THE DRUG NEURONTIN

13.     New pharmaceutical drugs may not be marketed in the United States until the sponsor of the pharmaceutical has proven to the FDA that the drug is safe and effective for specific indications at specified dosages. The indication and dosages approved by the FDA are set forth in the drug's labeling, the content of which is also approved by the FDA. Although it is not unlawful for physicians to prescribe approved drugs for indications or at dosages different than those set forth in a drug's labeling, the Food Drug and Cosmetic Act prohibits drug companies from marketing or promoting approved drugs for uses other than those set forth in the drug's approved labeling. This regulatory scheme protects patients and consumers by insuring that pharmaceutical companies do not promote drugs for uses other than those found to be safe

6

and effective by an independent, scientific governmental body.

14. Neurontin was approved by the FDA in 1993 for use as an "adjunctive therapy" for epilepsy in doses from 900 to 1800 milligrams per day. Adjunctive therapy means that the drug was approved as an add-on drug in the event that a primary anti-epilepsy drug was not successful. Neurontin is prescribed as either a tablet, capsule or oral solution and comes in various dosages.

15. At the time Neurontin was approved, Defendants' original patent on Neurontin was set to expire in December 1998. This left Defendants with only a small window of exclusivity for this drug. After the expiration of the Neurontin patent Defendants would be forced to share the market for Neurontin with generic drug manufacturers, substantially reducing their profits and their ability to keep Neurontin's retail price at a monopolistic level.

16. At the time Defendants filed their New Drug Application ("NDA") with the FDA, Defendants intended Neurontin to be used for other indications besides epilepsy adjunctive therapy. In October 1990, Defendants filed a patent for Neurontin claiming it to be effective in the treatment of depression. In November 1990, Defendants filed another patent application for Neurontin claiming it to be effective for the treatment of neurogenerative disease. In 1995, additional patent applications were filed by Defendants for mania and bipolar disease and for anxiety and panic. Notwithstanding the claims made in these patent applications, Defendants never sought FDA approval for the use of Neurontin to treat the conditions described in these four patent applications.

17. The market for adjunctive therapy for epilepsy patients is limited with a population potential of two million patients. To broaden its market, in the 1990s, Defendants

began illegally promoting Neurontin to physicians for at least eleven off-label uses, including pain management, psychiatric disorders, anxiety and depression. Defendants knew that if these markets could be infiltrated, they would enjoy enormous profits from Neurontin sales.

18. Initially, Defendants intended to file supplemental NDAs in order to expand Neurontin's approved indications, including applications for monotherapy (which would permit Neurontin to be prescribed by itself for epilepsy treatment) and for various psychiatric and neurological indications. However, by 1995 Defendants decided not to file the NDAs.

## V. DEFENDANTS' FRAUDULENT CONDUCT

19. Defendants designed and employed a variety of fraudulent practices to communicate false information to physicians regarding the safety and medical efficacy of Neurontin, to pay physicians for prescribing the drug, and to mislead third-party payors regarding the usage of Neurontin, all in an effort to increase sales of Neurontin.

20. Although federal regulations prohibited Defendants from promoting Neurontin for non-approved FDA uses, the regulations permitted a drug manufacturer to distribute publications created by independent third parties that described results of off-label uses of its drug, provided such materials were only distributed in response to non-solicited requests from physicians. Defendants devised a marketing strategy that fraudulently tried to make it appear that they were taking advantage of this narrow exception. Defendants hired and used medical liaisons to market Neurontin to physicians, rather than using their regular sales force, and to distribute medical literature to the physicians that was created by Defendants.

21. As part of Defendants' marketing scheme, Defendants also surreptitiously hired non-physician technical writers to write articles for medical journals, which Defendants

reviewed and approved, and then paid physicians for the right to use their names as the articles' "authors." Defendants then retained outside firms to broker these articles to various medical journals, to make it appear that the Defendants did not create and sponsor the articles themselves.

22.  To reward physicians for prescribing or advocating Neurontin, Defendants made substantial payments to physicians under the guise of "consultants" arrangements, medical education seminars, grants, and "studies," that required virtually nothing from the physicians.

23.  To ensure that third-party payors covered and paid for the drug, Defendants instructed and assisted pharmacists and others in ways to misrepresent the use of Neurontin in claims submitted to third-party payors so that the claims would be paid.

### A.  Defendants' Use of Medical Liaisons to Promote Neurontin Off-Label

24.  Because the normal marketing force was not permitted to deliver the off-label message, Defendants trained medical liaisons – technical employees of Defendants who were supposed to provide balanced scientific information to doctors – to market off-label and solicit interest in off-label uses. Commencing in 1995, Defendants increasingly hired medical liaisons and trained them to aggressively solicit requests for off-label information from physicians. Defendants trained the medical liaisons to unlawfully engage in full scale promotion of Neurontin's off-label uses, with the use of non-scientific, anecdotal information designed to convince physicians that off-label usage of Neurontin was safe and effective. In effect, Defendants used their medical liaisons as a surrogate sales force.

25.  Defendants knew this use of medical liaisons was inappropriate. High level personnel employed by Defendants acknowledged that the use of medical liaisons was a thinly

disguised method of violating the FDA's policies concerning off-label promotion.

26. On April 16, 1996, at a training session for medical liaisons, Defendants' in-house lawyers stopped the video taping of a medical liaison training session to advise the liaisons that notwithstanding formal policies to the contrary, liaisons were permitted to cold-call physicians as long as they had executed request forms (forms that supposedly verified that the physician had initiated the meeting) at the end of the call. Moreover, the liaisons were informed that the request forms could be filled out by Defendants' sales representatives instead of the doctors. Company lawyers also informed the liaisons during training sessions that there was no need to present balanced information to the customers, and that liaisons should always remember that sales were necessary in order to keep the company profitable. The liaisons were also informed by the lawyers, off camera, that there really was no definition of "solicitation" and that there were methods to induce the physicians to inquire about off-label uses. The lawyers also warned the liaisons that under no circumstances should any information about off-label uses be put in writing.

27. Medical liaisons were instructed in the clearest possible terms that they were to market and sell Neurontin based on its off-label uses. During a teleconference on May 24, 1996, John Ford, a senior marketing executive at Parke-Davis' Morris Plains headquarters, directly informed the medical liaisons that Neurontin had to be marketed for monotherapy, pain, bipolar disease, and other psychiatric uses, all of which were off-label. At another meeting with the medical liaisons, Ford was even blunter:

> I want you out there every day selling Neurontin. Look this isn't just me, it's come down from Morris Plains that Neurontin is more profitable. . . . We all know Neurontin's not growing adjunctive therapy, besides that is not where the money is. Pain management, now that's money. Monotherapy, that's money.

10

> We don't want to share these patients with everybody, we want them on Neurontin only. We want their whole drug budget, not a quarter, not half, the whole thing. . . . We can't wait for them to ask, we need to get out there and tell them up front. . . . That's where we need to be holding their hand and whispering in their ear Neurontin for pain, Neurontin for monotherapy, Neurontin for bipolar, Neurontin for everything. . . . I don't want to see a single patient coming off Neurontin until they have been up to at least 4800mg/day. I don't want to hear that safety crap either, have you tried Neurontin, every one of you should take one just to see there is nothing, it's a great drug.

28.  Thus, the medical liaisons were trained to cold call physicians and sell them on the medical safety and necessity of Neurontin for off-label uses. Key aspects of this selling were misrepresentations. The first thing to be misrepresented was usually the status of the medical liaisons. With the full approval of Defendants' marketing officials, including John Ford, Phil Magistro and John Krukar, medical liaisons were routinely introduced as specialists in the specific drug they were presenting at a particular meeting. Thus, medical liaisons would be presented as experts in anti-epileptic drugs at one moment and an hour later be an expert in cardiac medication. Medical liaisons also were encouraged to represent themselves as medical researchers, even though they neither conducted medical research nor analyzed medical research performed by others. It was not uncommon for medical liaisons to be introduced as physicians, even though they had no such qualifications. Sales personnel were instructed to introduce medical liaisons as scientific employees who were given monetary leave of their academic duties to make an individual presentation to the physician; the fact that the liaisons were part of Defendants' standard marketing detail was intentionally hidden.

29.  When questions arose concerning the availability of reimbursement for prescriptions for off-label uses of Neurontin, medical liaisons were instructed by Defendants to coach doctors on how to conceal the off-label nature of the prescription.

11

30.  Defendants took numerous actions to conceal their activities from the FDA and the public, including shredding documents, falsifying documents and encouraging medical liaisons to conduct their marketing activities without leaving a "paper trail" that might be discovered.

### B. Defendants' Misrepresented the Scientific Information, and Hence the Medical Efficacy, Concerning Off-Label Usages of Neurontin

31.  Extensive misrepresentations also were made regarding the scientific information concerning off-label usage of Neurontin. The following misrepresentations relating to off-label usage of Neurontin were routinely made to physicians in the Northeast and other customer business units with the knowledge and consent of persons such as Phil Magistro, John Krukar, and other of Defendants' marketing personnel.

1. *Bipolar Disorder.* Medical Liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated a 90% response rate when Neurontin was started at 900mg/day dosage and increased to a dosage of 4800mg/day. No such results existed. Nor was any type of clinical trial being conducted other than a pilot study. There were no clinical trials or studies indicating that Neurontin was safe or effective up to 4800mg/day. Indeed, Defendants were in possession at this time of clinical trial evidence which showed that there was no dose response difference between patients who received 600 mg, 1200 mg and 2400mg/day. Any data relating to the use of Neurontin for bipolar disorder was strictly anecdotal and of nominal scientific value. Indeed, most of the published reports on this topic had been written and commercially sponsored by Defendants, although this fact was

hidden. Medical liaisons were trained to inform psychiatrists that there were no reports of adverse effects for Neurontin when used for psychiatric purposes. In fact, such reports had been reported to Defendants' personnel but Defendants attempted to hide such reports from physicians.

2. *Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes.* Medical liaisons were trained and instructed to report that "leaks" from clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a 90% response rate in the treatment of pain was being reported. No such body of evidence existed. Nor was there any legitimate pool of data from which a response rate, much less a 90% response rate, could be calculated. Medical liaisons were trained to claim support for these findings as a result of inside information about clinical trials where no such information existed. The only support for these claims was anecdotal evidence of nominal scientific value. As discussed in more detail below, many of the published case reports were created and/or sponsored by Defendants in articles which frequently hid Defendants' involvement in the creation of the articles. Defendants' payment for the creation of these case reports was also hidden from physicians.

3. *Epilepsy Monotherapy.* Medical liaisons were strongly encouraged to push neurologists to prescribe Neurontin as the sole medication to treat epilepsy, even though studies only found it safe and effective as adjunctive therapy. Medical liaisons were trained to inform neurologists that substantial evidence supported Defendants' claim that Neurontin was effective as monotherapy. In fact, at this

time, Defendants knew that clinical trials regarding Neurontin's efficacy as a monotherapy were inconclusive. One of Defendants' clinical trials, 945-82, demonstrated that Neurontin was not an effective monotherapy agent; that the vast majority of epilepsy patients in the study taking Neurontin were unable to continue with Neurontin alone. The same study showed that there was no effective difference between administration of Neurontin at 600, 1200 or 2400mg/day. Notwithstanding this data, Defendants continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling. Indeed, although medical liaisons routinely claimed Neurontin to be effective as monotherapy, in 1997, the FDA refused to find Neurontin to be a safe and effective monotherapy.

4. *Reflex Sympathetic Dystrophy ("RSD")*. Medical liaisons informed physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD. The only such evidence that existed was anecdotal reports of nominal scientific value. Medical liaisons were trained to refer to case reports, most of which had been created or sponsored by Defendants as "studies."

5. *Attention Deficit Disorder ("ADD")*. Medical liaisons were instructed to inform pediatricians that Neurontin was effective for the treatment of ADD. No data, other than occasional anecdotal evidence, supported this claim. Nonetheless, the medical liaisons were trained to report that a large number of physicians had success treating ADD with Neurontin, when no such case reports existed.

6. *Restless Leg Syndrome ("RLS")*. RLS was another condition where Defendants' medical liaisons were trained to refer to a growing body of data relating to the condition, when no scientific data existed. The only reports were anecdotal, most of which had been created and/or sponsored by Defendants.

7. *Trigeminal Neuralgia.* Although medical liaisons represented that Neurontin could treat Trigeminal Neuralgia, again no scientific data supported this claim with the exception of occasional anecdotal reports. No data demonstrated that Neurontin was as effective as currently available pain killers, most of which were inexpensive.

8. *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD")*. Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions. No scientific data supported such claims with the exception of anecdotal reports of nominal scientific value.

9. *Migraine.* Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials. Although pilot studies were suggested and undertaken, no early results of clinical trials existed to support these claims. Once again, any data relating to treatment of migraines was purely anecdotal and of nominal scientific value. Most of the case reports were either created or sponsored by Defendants.

10. *Drug and Alcohol Withdrawal Seizures.* Medical liaisons suggested that Neurontin be used in the treatment of drug and alcohol withdrawals despite the

lack of any data supporting Neurontin as an effective treatment for these conditions.

32. Defendants knew these misrepresentations to physicians would cause physicians to provide inaccurate and untruthful medical advice to their patients regarding the medical safety and efficacy of Neurontin to treat off-label conditions. Nonetheless, the representations stated above were routinely made by Defendants' trained employees to physicians. Plaintiffs do not know all the physicians to whom all the representations were made and could not possibly know all the names because the information is within the custody and control of Defendants. Plaintiffs believe, however that such misrepresentations were made to physicians by Michael Davies, Joseph McFarland, Phil Magistro, Lisa Kellett, Joseph Dymkowski, Daryl Moy, Richard Grady, Ken Lawler and others. Medical liaisons were trained to deliver the misrepresentations described above as part of Defendants' standard pitch to physicians on off-label uses of Neurontin.

33. Not all physicians targeted by Defendants would have received all of the misrepresentations described above. Each specialist would have received the misrepresentations relating to his or her practice. For example, if a physician's practice focused on epilepsy, that doctor would not have received information relating to the treatment of ADD, but he or she would have received misrepresentations relating to monotherapy. Regardless of the speciality, unsupported claims of effectiveness for off-label usage was a key portion of medical liaisons' presentations relating to Neurontin.

34. As a former medical liaison employed by Defendants, Dr. David Franklin makes the following allegations in support of his *qui tam* action:

- Upon order of the company, and as a result of medical liaison training, Dr. Franklin "deliberately contrived reports to mislead physicians into believing that a body of data existed that demonstrated the effectiveness of Neurontin in the treatment of bipolar disease." In fact, no data existed to support the use of Neurontin for bipolar disease.

- Dr. Franklin was trained and instructed to actively deceive physicians with contrived data, falsified "leaks" from clinical trials, scientifically flawed reports, or "success stories" that stated that Neurontin was highly effective in the treatment of a variety of pain syndromes. No such body of evidence existed.

- Dr. Franklin was instructed to advise physicians that Defendants had developed a large body of data to support the use of Neurontin as monotherapy. This was an "outright lie" and left patients unknowingly without good seizure control.

- Medical liaisons were instructed to tell physicians that a great deal of data existed supporting the safe use of Neurontin at levels that exceed 4800 mg/day. However, clinical safety data existed at dosing levels of only 1800 mg/day.

- Defendants provided medical liaisons with slides that stated that Neurontin was effective for the treatment of ADD, but no data existed to support that claim.

35. A group of Defendants' executives called the "New Products Committee" agreed to the strategy by which Defendants would pay for clinical trials to test Neurontin for a variety of uses, including bipolar disorder, social phobia, migraine and chronic pain, and then publicize the results of those trials through medical journals and medical conventions. The head of this committee was the then-president of Parke-Davis, Tony Wild.

36. Defendants publicized these clinical trial results, without disclosing evidence showing that Neurontin was not effective for these off-label conditions.

### C. The Concealed Role Defendants had in the Creation and Sponsorship of Publications Aimed to Sell Neurontin to Off-Label Markets

37. Misrepresentations by Defendants were not limited to presentations made by

17

medical liaisons. Defendants distributed materials to physicians that intentionally misrepresented Defendants' role in the creation and sponsorship of certain publications. Many of the publications were written by third parties retained by Defendants who were under Defendants' control. The fact that these articles were authored by ghost-writers retained by, and whom had financial ties to Defendants, was intentionally concealed in the articles. For example, an article widely circulated by Defendants concerning Neurontin use in the treatment of Restless Leg Syndrome asserted that the authors, Gary A. Mellick and Larry B. Mellick, had not and never would receive financial benefit from anyone with an interest in Neurontin. The Mellick brothers, in fact, received tens of thousands of dollars for acting as speakers at Defendants' events.

38.   Similarly, Defendants often rewarded doctors for their advocacy of Neurontin by paying them honorarium for lending their names to scientific articles which were actually prepared and written by third parties retained by Defendants. For example, in 1996, Defendants retained AMM/Adelphie, Ltd. and Medical Education Systems, Inc. ("MES") to prepare no less than twenty articles for publication in various neurology and psychiatry journals. These articles were written by non-physician technical writers retained by Defendants, and Defendants controlled the content of all of the articles, but yet the authors were fraudulently listed as independent physicians.

39.   The physician "authors" were paid an honorarium of $1,000 to lend their names to these articles, and also were able to claim publication credit on their curriculum vitae. This even occurred in connection with case histories that purported to describe the "author's" personal treatment of actual patients.

40. Defendants' role in creating, approving and sponsoring the articles was hidden from the public. While the articles might reference that the physician author received an honorarium from an outside firm, the articles did not disclose that Defendants had paid the honorarium or that Defendants had controlled the content of the articles. For example, an article created by MES, *Gabapentin and Lamotrignine: Novel Treatments for Mood and Anxiety Disorders*, published in CNS Spectrums noted that "an honorarium was received [by the physician "authors"] from Medical Education Systems for preparation of this article," but never revealed that Defendants' hired MES or that MES personnel, while under contract to Defendants, wrote the article.

41. Defendants used these publications as part of their fraudulent marketing strategy. Defendants presented the articles to physicians as evidence of independent research conducted by persons with no monetary interest in Neurontin, knowing this was a misrepresentation used to induce sales of Neurontin.

42. Defendants also paid gratuities to physicians to use Neurontin for so-called "studies" that lacked scientific value. Payments Defendants made for "studies" included, but were not limited to the following:

| **Funded Project Payment** | **Payment** |
| --- | --- |
| Statistical Analysis of Patients Treated With Neurontin for Pain | $7,000 |
| Reduction of Sympathetically Medicated Pain and Sudomotor Function | $7,000 |
| Trial of Neurontin for Distal Symmetric Polyneuropathy Associated with AIDS | $20,000 |
| Neurontin for Neuropathic Pain in Chronic Pain Syndromes | $25,000 |
| Retrospective Analysis of Neurontin Use with Bipolar Disorder Patients | $5,000 |

| | |
|---|---|
| Retrospective Analysis of Neurontin in the Treatment of Pain | $2,000 |
| Retrospective Analysis of Neurontin in the Treatment of Chronic Pain | $8,000 |
| Case histories relating to use of Neurontin as an adjuvant analgesic | $4,000 |

43. One particularly large "study" conducted by Defendants served as yet another engine to financially reward physicians for prescribing Neurontin. In 1995 and 1996, Defendants conducted an enormous clinical trial know as STEPS. STEPS was a marketing tool designed to induce neurologists to prescribe Neurontin at far higher doses than indicated in the FDA approved labeling. In contrast to authentic clinical studies, which have a limited number of investigators treating a number of patients qualified for the study, the STEPS protocol called for over 1,200 "investigators" to enroll only a few patients each. This way Defendants could channel payments to physician "investigators." The participating physicians were instructed to titrate their patients to higher than labeled dosages of Neurontin to demonstrate that patients could tolerate high dosages of the drug, which increased sales of Neurontin.

44. Physicians enrolling in the STEPS study were paid for agreeing to participate in the study and for every patient they enrolled. At the conclusion of the study, Defendants offered the 1,200 investigators additional cash for each patient the doctors kept on Neurontin after the study ended. These payments were unquestionably kickbacks, each participating doctor was expressly paid for writing Neurontin prescriptions for their patients.

### D. Defendants' Systematic Payments to Doctors for the Purpose of Increasing Neurontin Prescriptions

45. Defendants' marketing strategy used physicians (and Defendants' medical liaisons) to perform the work normally performed by the companies' sales force in order to promote Neurontin. Defendants made tens of thousands of payments to physicians for the