purpose of having those doctors either recommend the prescription of Neurontin or to prescribe Neurontin themselves. A description of the various programs Defendants used to make these payments to physicians follows.

### (1)    Consultants Meetings

46.    Physicians were often recruited and paid by Defendants to attend dinners or conferences where the physicians would be encouraged to prescribe Neurontin for non-medically necessary off-label uses. Defendants had some doctors sign sham consulting agreements and attend the meetings as a paid consultant. These consultants were not required to provide any bona fide service in exchange for the money. The payments were solely to cause the physicians to prescribe Neurontin.

47.    A typical "consultants" meeting was held in Jupiter Beach, Florida for neurologists during the weekend of April 19-21, 1996. The "consultants" selected for this meeting were not chosen on the basis of their consulting skills, but because of their potential to write Neurontin prescriptions. In a memorandum announcing the event to Defendants' personnel, the Neurontin Marketing Team acknowledged that in order to target neurologists with the greatest potential for writing Neurontin prescriptions, sales personnel must select potential attendees from a list of the top prescription writers for anti-epileptic drugs in the Northeast; only persons who fell within this desirable demographic were allowed to be invited.

48.    Qualifying physicians were given round-trip airfare to Florida (worth $800), two-nights accommodations (worth $340), free meals and entertainment, ground transportation and a "consultant's fee" of $250. Ample time was provided for the consultants to enjoy the beach resort. The value of the junket was approximately $2,000 per physician.

21

49.    The Jupiter Beach consultants meeting included two half days of presentations by Defendants relating to Neurontin, including extensive presentations relating to off-label uses. The presentations were made to appear as if sponsored by an independent company, Proworx. however, all aspects of the presentations were designed, monitored, and approved by Defendants. The Defendants selected the speakers, picked the topics and previewed the content of the presentations to make sure that they were acceptable. Defendants paid all of the expenses relating to the meeting. Notwithstanding the FDA's prohibition regarding the provision of promotional materials on off-label uses, Defendants provided written abstracts of the presentations that detailed off-label use of Neurontin to each of its "consultants."

50.    No effort was made to obtain professional advise at Jupiter Beach from the "consultants" Defendants had wined, dined, and entertained during the weekend. A follow-up memorandum to Defendants' marketing officials noted that "the participants were delivered a hard hitting message about Neurontin" and emphasized that the participants were encouraged to use Neurontin at higher doses. More importantly, after the conference Defendants generated "trending worksheets" listing the doctors who attended the consultants meeting. These worksheets enabled Defendants to track Neurontin prescription-writing habits of the attendees before and after the consultants meetings to determine if these "high writing" prescribers wrote more Neurontin prescriptions after the conference. Persuading these heavy prescribers to order more Neurontin for their patients was the sole purpose of the Jupiter Beach junket.

51.    Jupiter Beach was not unique. Defendants hosted dozens of consultants meetings between late 1995 and 1997 in which the "consultants" received payments and gratuities as well as presentations on off-label Neurontin uses designed to change the physicians' prescription

22

writing habits.  Comparable consultants meetings included, but were not limited to, the following:

| Topic | Location | Dates |
|---|---|---|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, NM | Nov. 16-19, 1995 |
| Neurontin Consultants Conference | Marco Island, FL | February 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | February 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | February 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | March 8-10, 1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen, CO | April 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | April 20, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | April 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Ranch Bernardo, CA | June 28-30, 1996 |
| Use of Anti-Convulsants in in Psychiatric Disorders | Short Hills, NJ | Oct. 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | Sept. 27-28, 1997 |

Hundreds, if not thousands, of physicians received financial incentives to attend these events.

52.    Not all payments to consultants were made at conferences as elaborate as Jupiter

23

Beach. Many consultants meetings consisted of lavish dinners at local restaurants. The emphasis on these meetings was also on off-label uses, and $200 "honorariums" were paid to the physicians who did nothing for the payment except show up. At none of the events did the consultants provide legitimate consultation to Defendants, but at all of the events the "consultants" were encouraged to increase their Neurontin prescription writing.

### (2)    Medical Education Seminars

53.    Another format in which Defendants paid financial incentives to physicians were programs billed as Continuing Medical Education (CME) seminars. These conferences and seminars were set up to appear as "independent seminars" to qualify for an exception to the FDA's off-label marketing restrictions. Such seminars, however, must be truly independent of the drug companies. For example, drug companies may make "unrestricted grants" to fund a seminar, but may not be involved in formulating the content of the presentations, picking the speakers or selecting the attendees. None of these requirements were observed with regard to the CME seminars sponsored by Defendants for the promotion of off-label uses of Neurontin. While Defendants retained third-party organizations, such as Proworx and MES to present the seminars, Defendants had control of virtually every aspect of these events, and the seminar companies obtained Defendants' approval for all content presented at the seminars. Defendants also paid all expenses, including all the seminar companies' fees.

54.    For some seminars, high prescription writing physicians were selected to receive junkets comparable to those Defendants provided to the attendees of the Jupiter Beach consultants meetings. Others were less lavish, but physicians received free tuition, free accommodations, free meals, and cash. Frequently Defendants' CME seminars were accredited

24

by continuing medical education organizations which meant that the physicians taking advantage of Defendants' junkets did not have to pay tuition or spend additional time to fulfill their continuing medical education licensor requirements by attending truly independent medical education programs.

55.    Representative CME programs sponsored by Defendants where they paid extensive incentives to attending physicians, included, but are not limited to, the following:

| Seminar | Location | Date |
| --- | --- | --- |
| Merritt-Putnam Epilepsy Postgraduate Course | | January 19, 1996 |
| Merritt-Putnam Seminar | Chicago, IL | January 26, 1996 |
| New Frontiers in AntiEpileptic Drug Use | California | Sept.-Oct. 1996 |
| Diabetic Neuropathy | Ritz Carlton, Boston, MA | June 22-24, 1997 |
| Merritt Putnam Symposium | Key Biscayne, FL | September 11, 1997 |
| Merritt Putnam Conference on Monotherapy | Palm Springs, CA | September 19, 1997 |
| Merritt Putnam Conference on Monotherapy | St. Louis, MO | October 3, 1997 |
| Merritt Putnam Symposium | Boston, MA | December 5, 1997 |

### (3)    Grants and "Studies"

56.    Defendants also made outright payments, in the form of grants, to reward demonstrated Neurontin believers and advocates. Defendants' sales managers identified key doctors who actively prescribed Neurontin or programs which were willing to host Neurontin speakers and encouraged such persons or programs to obtain "educational grants" from Defendants.

57.    These grants, and others, were charged to Defendants' Neurontin marketing budget. Each of these grants were made solely because the individual receiving the money was a large Neurontin supporter and/or would host a program where a well known Neurontin supporter would recommend that other physicians increase their prescriptions of Neurontin. Each of these grant awards constituted a reward or kickback for the recipient's advocacy of Neurontin.

58.    Defendants' medical liaisons informed leading Neurontin prescribers that significant advocacy for Neurontin would result in the payment of large grants. These studies did not involve significant work for the physicians. Often times they required little more than collating and writing up office notes or records. Indeed, as discussed above, Defendants frequently hired technical writers to write the articles for which the "authors" had been given grants.

### (4)    Speakers Bureau

59.    Defendants also formed the Speakers Bureau as a subterfuge to pay kickbacks and gratuities to physicians for prescribing Neurontin, particularly for off-label uses. The Speakers Bureau sponsored teleconferences, dinner meetings, consultants meetings, educational seminars, and other events where the off-label uses of Neurontin were marketed. The speakers at these events were physicians who gave short presentations relating to Neurontin for which they were paid by Defendants anywhere from $250 to $3,000 per event. Many speakers received tens of thousands of dollars annually in exchange for recommending to fellow physicians that Neurontin be prescribed, particularly for off-label uses. The payments were far in excess of the fair value of the work the physicians performed for Defendants. Plaintiffs believe that extensive payments through the Speakers Bureau took place at least from 1995 through 2000.

26

60.    Defendants' marketing personnel, including its medical liaison staff, informed physicians of the lucrative rewards of joining the Neurontin Speakers Bureau. Physicians were informed that if they prescribed enough Neurontin, they, too, could be eligible for receiving substantial payments just for describing their clinical experience to peers at events dedicated to promoting Neurontin's off-label uses. Defendants' marketing personnel, however, made it clear that the only way the doctors could receive such cash payments was if they prescribed substantial amounts of Neurontin to their patients, preferably for off-label uses.

61.    Defendants were aware that these payments did not comply with the American Medical Association's guidelines for payments to physicians. They knew and intended that the payments were made for the express purpose of encouraging the physicians to prescribe Neurontin to their patients.

62.    In 1997, in the wake of an investigation by the FDA, Defendants conducted a review of their marketing practices in light of existing federal kickback prohibitions. As a result of that review, Defendants determined that none of the programs described above should have been conducted in the manner previously conducted by Defendants. Defendants issued guidelines which essentially prohibited each of the programs described above. Nonetheless, Defendants' payments to physicians for the off-label marketing of Neurontin did not cease and the programs continued until at least 1998. Because Defendants' records demonstrate payments of inappropriate kickbacks and incentives to doctors through 1998, Plaintiff believes that such payments continued through the merger of Parke-Davis' parent, Warner-Lambert, with Defendant Pfizer, or perhaps even through the calling of a grand jury regarding Parke-Davis' marketing practices relating to Neurontin.

27

28

## VI. THE ROLE OF NON-PHYSICIAN TECHNICAL WRITERS, PHYSICIANS AND VENDORS IN DEFENDANTS' MARKETING SCHEME

63.    The non-physician technical writers, physician "authors," and vendors, namely AMM/Adelphie Ltd. ("AMM") and Medical Educational Systems, Inc. ("MES"), (collectively referred to herein as the "Promotional Strategists") were key parties in Defendants' improper marketing and sales scheme, as they were the parties who knowingly and willfully facilitated, communicated and distributed the misrepresentations concerning the use of Neurontin for off-label uses. The non-physician technical writers wrote articles based on inaccurate – and in some cases no – scientific evidence concerning the safety and efficacy of Neurontin to treat off-label symptoms. The physicians lent their names as "authors" to such articles, misrepresenting the authorship and objectivity of such articles. And, AMM and MES (hereinafter "Vendors") caused these articles to be published in a variety of medical journals across the country. In addition, the physicians who performed and participated in sham "studies" regarding the safety and efficacy of Neurontin for off-label uses were key parties to Defendants' scheme as these physicians knowingly misrepresented facts and evidence concerning Neurontin's off-label uses.

64.    The Promotional Strategists were active participants in Defendants' scheme and were aware of, and interacted with, other participants in the fraudulent scheme.

65.    The Promotional Strategists operated collectively, for a common purpose and as a continuing unit to perpetrate the fraudulent scheme relating to Neurontin.

66.    The Promotional Strategists' collective knowledge, involvement and activity is evidenced by:

(a)    The failure of the Promotional Strategists to advise government regulators (including Medicaid), private insurers and patients, including Plaintiffs and the Classes, of the

29

existence and spread of such misinformation concerning off-label uses of Neurontin;

(b)    The acceptance by the Promotional Strategists of various types of incentives from Defendants in return for their agreement to write, author and have published articles containing misrepresentations knowing that other physicians and third-party payors would rely on such information; and

(c)    The agreement of the Promotional Strategists to permit Defendants to control the information relayed to the public in such articles.

## VII. DEFENDANTS' MOTIVE

67.    Defendants' motive in creating and operating the fraudulent scheme and RICO Enterprises described herein was to fraudulently obtain additional sales and revenues from Neurontin.

68.    The fraudulent scheme was designed to, and did, cause Plaintiffs and the Classes to pay claims for Neurontin to treat conditions for which the drug is not medically necessary. The fraudulent scheme also caused Plaintiffs and the Classes to pay claims for Neurontin to treat non-FDA approved conditions. In the absence of Defendants' improper conduct, Plaintiffs and the Classes would not have paid for such Neurontin claims.

## VIII. USE OF THE MAILS AND WIRES

69.    During the Class Periods, Defendants used thousands of mail and interstate wire communications to create and manage their fraudulent scheme. Defendants' scheme involved national marketing and sales plans and programs, and encompassed physicians and victims across the country.

70.    Defendants' use of the mails and wires to perpetrate their fraud involved

thousands of communications throughout the Class Periods, including:

      (a)    Marketing and advertising materials about the off-label uses of Neurontin for which the drug is not safe and medically efficacious, such materials being sent to doctors across the country;

      (b)    Communications, including financial payments, with the Vendors, non-physician technical writers, and physician "authors" discussing and relating to the publication of articles touting off-label uses of Neurontin for which the drug is not safe and medically efficacious, as detailed above;

      (c)    Communications with the Vendors, doctors and private insurers that fraudulently represented that Neurontin was scientifically proven to be safe and effective for off-label uses;

      (d)    Communications with health insurers and patients, including Plaintiffs and the Classes, inducing payments for Neurontin to be made in reliance on misrepresentations concerning the use of Neurontin for non-medically necessary uses; and

      (e)    Receiving the proceeds of the Defendants' improper scheme.

    71.    In addition, Defendants' corporate headquarters have communicated by United States mail and by facsimile with various local district managers, medical liaisons and pharmaceutical representatives in furtherance of Defendants' schemes.

31

## IX. CLASS ACTION ALLEGATIONS

72.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action

on behalf of themselves and two Classes defined as:

> Class 1:
>
> All entities with health insurance plans that covered Neurontin
> only for indications approved by the FDA and that paid claims for
> Neurontin for indications not approved by the FDA during the
> period from January 1, 1994 through the present.

Excluded from Class 1 are (a) Defendants and any entity in which any Defendant has a

controlling interest, and their legal representatives, officers, directors, assigns and successors,

and (b) any co-conspirators.

> Class 2:
>
> All entities that paid claims for Neurontin for medical conditions
> for which Neurontin was not medically safe and efficacious during
> the period from January 1, 1994 through the present.

Excluded from the Class 2 are (a) Defendants and any entity in which any Defendant has a

controlling interest, and their legal representatives, officers, directors, assigns and successors,

and (b) any co-conspirators.

73.    Classes 1 and 2 consist of numerous individuals and entities throughout the

United States, making individual joinder impractical, in satisfaction of Rule 23(a)(1). The

disposition of the claims of members of Classes 1 and 2 in a single class action will provide

substantial benefits to all parties and to the Court.

74.    The claims of the representative Plaintiffs are typical of the claims of each of their

respective Classes, as required by Rule 23(a)(3), in that the representative Plaintiffs include

entities that, like all Class members, (1) covered Neurontin only for indications approved by the

FDA yet paid claims for Neurontin to treat conditions for which the drug was not approved by the FDA (Class 1), and (2) limited coverage for Neurontin to medically necessary uses yet paid for Neurontin to treat conditions for which the drug is not medically safe and efficacious (Class 2). Such representative Plaintiffs, like all members of the Classes, have been damaged by Defendants' misconduct, in that, among other things, they paid for Neurontin to treat conditions for which the drug was not medically effective or safe and for which the drug was not FDA-approved.

75.     The factual and legal bases of Defendants' misconduct are common to all members of the Classes and represent a common thread of fraud and other misconduct resulting in injury to Plaintiffs and all members of the Classes.

76.     There are many questions of law and fact common to Plaintiffs and the Classes, and those questions predominate over any questions that may affect individual Class members, within the meaning of Rule 23(a)(2) and 23(b)(3). Common questions of law and fact include, but are not limited to, the following:

(a)     Whether Neurontin is medically necessary for uses not approved by the FDA;

(b)     Whether Defendants engaged in a fraudulent and/or deceptive scheme of improperly marketing and selling Neurontin for conditions to which it is not safe or medically efficacious;

(c)     Whether Defendants engaged in a fraudulent and/or deceptive scheme of improperly marketing and selling Neurontin to treat conditions for which the drug was not approved by the FDA;

33

(d)    Whether Defendants instructed or coached doctors on how to conceal the off-label nature of Neurontin on claim forms submitted to Plaintiffs and members of the Classes;

(e)    Whether it was the policy and practice of Defendants to prepare, fund and publish materials which contained false information and misrepresentations regarding off-label uses for Neurontin;

(f)    Whether Defendants paid non-physician technical writers to write articles containing misinformation and misrepresentations concerning purported scientific evidence regarding the safety and medical efficacy of Neurontin to treat off-label conditions;

(g)    Whether Defendants paid physicians to "author" articles written by others containing misinformation and misrepresentations concerning purported scientific evidence regarding uses of Neurontin for which it has not been scientifically proven to be safe or medically effective;

(h)    Whether Defendants paid Vendors, namely AMM and MES, to market articles containing misinformation and misrepresentations concerning purported scientific evidence regarding off-label uses of Neurontin for which the drug is not safe or medically necessary;

(i)    Whether Defendants are liable to the Class Members for damages for conduct actionable under common law fraud and unjust enrichment;

(j)    Whether Defendants are liable to the Class Members for damages for conduct actionable under the various state consumer protection laws;

(k)    Whether Defendants engaged in a pattern and practice that directly caused Plaintiffs and Class Members to pay for Neurontin claims that were for non-medically necessary

34

uses;

      (l)    Whether Defendants engaged in a pattern and practice that directly caused Plaintiffs and Class Members to pay for Neurontin claims that were for non-FDA approved uses, and

      (m)    Whether Defendants engaged in a pattern of deceptive and/or fraudulent activity with the intent to defraud Plaintiffs and the Class Members.

    77.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes, as required by Rule 23(a)(4). Plaintiffs have retained counsel with substantial experience in prosecuting nationwide class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the Classes.

    78.    Plaintiffs and members of the Classes have suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy under Rule 23(b)(3). Absent a class action, most members of the Classes likely would find the cost of litigating their claims to be prohibitive, and will have no effective remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication. Additionally, Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Classes and require Court imposition of uniform relief to ensure compatible standards of conduct toward the Classes, thereby making appropriate equitable relief to the Classes as a whole within the meaning of Rule

35

23(b)(1) and (b)(2).

## TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

79.     Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and members of the Classes have been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiffs and members of the Classes could not reasonably have discovered the fraudulent nature of Defendants' conduct. Accordingly, Defendants are estopped from relying on any statute of limitations.

## COUNT ONE
### Violation of 18 U.S.C. § 1962(c)
### (The MES Enterprise)
### Class 1 and 2

80.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

81.     Defendants are the "persons" within the meaning of § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

82.     MES is an "enterprise" which was created and/or used as a tool to effectuate Defendants' pattern racketeering activity. The Defendant "persons" are distinct from MES as the enterprise.

83.     The MES Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased or provided Neurontin to thousands of individuals throughout the United States.

84.     Defendants have exerted control over the MES Enterprise, and Defendants have

36

participated in the operation or management of the affairs of the MES Enterprise, through the following actions:

(a)     Defendants have asserted direct control over the information and content disseminated to the Vendors (including MES), doctors and the public regarding the medical safety and efficacy of Neurontin for off-label uses in articles published across the country;

(b)     Defendants have asserted direct control over the creation and distribution of mass-marketing and sales materials sent to Vendors and doctors throughout the United States; and

(c)     Defendants have placed their own employees and agents in positions of authority and control in the MES Enterprise.

85.   Defendants have conducted and participated in the affairs of the MES Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), as described above.

86.   In implementing their fraudulent scheme, Defendants were acutely aware that Plaintiffs and members of the Classes depend on the honesty of Defendants in representing the safety and medical efficacy of Neurontin's uses.

87.   As detailed above, Defendants' fraudulent scheme consisted of, *inter alia*: (a) causing providers to misrepresent the off-label use(s) for which Neurontin was being prescribed so that Plaintiffs and members of the Class were unaware that contrary to their plan language they were paying Neurontin claims for off-label uses; (b) deliberately misrepresenting the uses for which Neurontin was safe and effective so that Plaintiffs and members of the Classes paid for this drug to treat symptoms for which it was not scientifically proven to be safe and effective; (c)

37

publishing or causing to have published materials containing false information upon which physicians, Plaintiffs and members of the Classes relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses for which the drug is not scientifically proven to be safe or medically efficacious; and (d) actively concealing, and causing others to conceal, information about the true safety and efficacy of Neurontin to treat conditions for which it had not been approved by the FDA.

88.    Defendants' scheme was calculated to ensure that Plaintiffs and the Classes would pay claims for Neurontin to treat a wide variety of uses which Defendants knew were not necessarily treatable with Neurontin.

89.    Each of Defendants' fraudulent mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

90.    Defendants engaged in a pattern of racketeering activity intending to defraud Plaintiffs and the Classes.

91.    The above described racketeering activities amounted to a common course of conduct intended to deceive Plaintiffs and the Classes. Defendants' criminal acts of racketeering had the same pattern and similar purpose of defrauding Plaintiffs and the Classes. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs and the members of the Classes. Defendants' fraudulent activities are part of their regular way of conducting their ongoing business and constitute a continuing threat to the

38

property of Plaintiffs and the Classes.

92.    The pattern of racketeering activity alleged herein and the MES Enterprise are

separate and distinct from each other. Defendants engaged in a pattern of racketeering activity

alleged herein for the purpose of conducting the affairs of the MES Enterprise.

93.    Plaintiffs and members of the Classes have been injured in their property by

reason of these violations in that Plaintiffs and members of the Classes have made millions of

dollars in overpayments for Neurontin.

94.    Plaintiffs and the members of the Classes relied, to their detriment, on

Defendants' fraudulent misrepresentations and omissions.

95.    Plaintiffs' and the Classes' injuries were directly and proximately caused by

Defendants' racketeering activity as described above.

96.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and

severally liable to Plaintiffs and the Classes for three times the damages Plaintiffs and the

Classes have sustained, plus the cost of this suit, including reasonable attorneys' fees.

**COUNT TWO**
**Violation of 18 U.S.C. § 1962(c)**
**(The AMM Enterprise)**
**Class 1 and 2**

97.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth

herein.

98.    Defendants are the "persons" within the meaning of § 1961(3) who conducted the

affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §

1962(c).

99.    AMM is an "enterprise" which was created and/or used as a tool to effectuate

39

Defendants' pattern racketeering activity. The Defendant "persons" are distinct from AMM as the enterprise.

100.    The AMM Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased or provided Neurontin to thousands of individuals throughout the United States.

101.    Defendants have exerted control over the AMM Enterprise, and Defendants have participated in the operation or management of the affairs of the AMM Enterprise, through the following actions:

(a)    Defendants have asserted direct control over the information and content disseminated to the Vendors (including AMM), doctors and the public regarding the medical safety and efficacy of Neurontin for off-label uses in articles published across the country;

(b)    Defendants have asserted direct control over the creation and distribution of mass-marketing and sales materials sent to Vendors and doctors throughout the United States; and

(c)    Defendants have placed their own employees and agents in positions of authority and control in the AMM Enterprise.

102.    Defendants have conducted and participated in the affairs of the AMM Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), as described above.

103.    In implementing their fraudulent scheme, Defendants were acutely aware that Plaintiffs and members of the Classes depend on the honesty of Defendants in representing the safety and medical efficacy of Neurontin's uses.

40