presentations to make sure that they were acceptable. Defendants paid all of the expenses relating to the meeting. Notwithstanding the FDA's prohibition regarding the provision of promotional materials on off-label uses, Defendants provided written abstracts of the presentations that detailed off-label use of Neurontin to each of its "consultants."

50. No effort was made to obtain professional advise at Jupiter Beach from the "consultants" Defendants had wined, dined, and entertained during the weekend. A follow-up memorandum to Defendants' marketing officials noted that "the participants were delivered a hard hitting message about Neurontin" and emphasized that the participants were encouraged to use Neurontin at higher doses. More importantly, after the conference Defendants generated "trending worksheets" listing the doctors who attended the consultants meeting. These worksheets enabled Defendants to track Neurontin prescription-writing habits of the attendees before and after the consultants meetings to determine if these "high writing" prescribers wrote more Neurontin prescriptions after the conference. Persuading these heavy prescribers to order more Neurontin for their patients was the sole purpose of the Jupiter Beach junket.

51. Jupiter Beach was not unique. Defendants hosted dozens of consultants meetings between late 1995 and 1997 in which the "consultants" received payments and gratuities as well as presentations on off-label Neurontin uses designed to change the physicians' prescription writing habits. Comparable consultants meetings included, but were not limited to, the following:

| Topic | Location | Dates |
|---|---|---|
| Mastering Epilepsy | La Costa Resort, CA | July 20-23, 1995 |
| Mastering Epilepsy | Santa Fe, NM | Nov. 16-19, 1995 |

| | | |
|---|---|---|
| Neurontin Consultants Conference | Marco Island, FL | February 2-4, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | February 9-11, 1996 |
| Mastering Epilepsy Science | Walt Disney World, FL | February 22-25, 1996 |
| Pediatric Epilepsy | Hutchinson Island, FL | March 8-10, 1996 |
| Mastering Epilepsy | Ritz Carlton, Aspen, CO | April 18-21, 1996 |
| Affective Disorders in Psychiatry | Marco Island, FL | April 20, 1996 |
| Affective Disorder Consultants Conference | Southern Pines, NC | April 27, 1996 |
| Neuropathic Pain Conference | Palm Beach, FL | May 11, 1996 |
| Regional Consultants Conference | Ritz Carlton, Boston, MA | May 10-11, 1996 |
| Epilepsy Management Advisors Meeting | Sheraton Grande Torrey Pines, La Jolla, CA | June 21-23, 1996 |
| Epilepsy Management | Ranch Bernardo, CA | June 28-30, 1996 |
| Use of Anti-Convulsants in in Psychiatric Disorders | Short Hills, NJ | Oct. 18-19, 1996 |
| Non-epileptic Uses of Neurontin | Longboat Key, FL | Nov. 6, 1996 |
| Neurological Conditions Conference | Ritz Carlton, Atlanta, GA | Sept. 27-28, 1997 |

Hundreds, if not thousands, of physicians received financial incentives to attend these events.

52. Not all payments to consultants were made at conferences as elaborate as Jupiter Beach. Many consultants meetings consisted of lavish dinners at local restaurants. The emphasis on these meetings was also on off-label uses, and $200 "honorariums" were paid to the physicians who did nothing for the payment except show up. At none of the events did the consultants provide legitimate consultation to Defendants, but at all of the events the "consultants" were encouraged to increase their Neurontin prescription writing.

**(2)    Medical Education Seminars**

53. Another format in which Defendants paid financial incentives to physicians were programs billed as Continuing Medical Education (CME) seminars. These conferences and seminars were set up to appear as "independent seminars" to qualify for an exception to the FDA's off-label marketing restrictions. Such seminars, however, must be truly independent of the drug companies. For example, drug companies may make "unrestricted grants" to fund a seminar, but may not be involved in formulating the content of the presentations, picking the speakers or selecting the attendees. None of these requirements were observed with regard to the CME seminars sponsored by Defendants for the promotion of off-label uses of Neurontin. While Defendants retained third-party organizations, such as Proworx and MES to present the seminars, Defendants had control of virtually every aspect of these events, and the seminar companies obtained Defendants' approval for all content presented at the seminars. Defendants also paid all expenses, including all the seminar companies' fees.

54. For some seminars, high prescription writing physicians were selected to receive junkets comparable to those Defendants provided to the attendees of the Jupiter Beach consultants meetings. Others were less lavish, but physicians received free tuition, free accommodations, free meals, and cash. Frequently Defendants' CME seminars were accredited by continuing medical education organizations which meant that the physicians taking advantage of Defendants' junkets did not have to pay tuition or spend additional time to fulfill their continuing medical education licensor requirements by attending truly independent medical education programs.

55. Representative CME programs sponsored by Defendants where they paid extensive incentives to attending physicians, included, but are not limited to, the following:

| **Seminar** | **Location** | **Date** |
|---|---|---|
| Merritt-Putnam Epilepsy Postgraduate Course | | January 19, 1996 |
| Merritt-Putnam Seminar | Chicago, IL | January 26, 1996 |
| New Frontiers in AntiEpileptic Drug Use | California | Sept.-Oct. 1996 |
| Diabetic Neuropathy | Ritz Carlton, Boston, MA | June 22-24, 1997 |
| Merritt Putnam Symposium | Key Biscayne, FL | September 11, 1997 |
| Merritt Putnam Conference on Monotherapy | Palm Springs, CA | September 19, 1997 |
| Merritt Putnam Conference on Monotherapy | St. Louis, MO | October 3, 1997 |
| Merritt Putnam Symposium | Boston, MA | December 5, 1997 |

### (3) Grants and "Studies"

56. Defendants also made outright payments, in the form of grants, to reward demonstrated Neurontin believers and advocates. Defendants' sales managers identified key doctors who actively prescribed Neurontin or programs which were willing to host Neurontin speakers and encouraged such persons or programs to obtain "educational grants" from Defendants.

57. These grants, and others, were charged to Defendants' Neurontin marketing budget. Each of these grants were made solely because the individual receiving the money was a large Neurontin supporter and/or would host a program where a well known Neurontin supporter would recommend that other physicians increase their prescriptions of Neurontin. Each of these grant awards constituted a reward or kickback for the recipient's advocacy of Neurontin.

58. Defendants' medical liaisons informed leading Neurontin prescribers that significant advocacy for Neurontin would result in the payment of large grants. These studies did

24

not involve significant work for the physicians. Often times they required little more than collating and writing up office notes or records. Indeed, as discussed above, Defendants frequently hired technical writers to write the articles for which the "authors" had been given grants.

### (4) Speakers Bureau

59. Defendants also formed the Speakers Bureau as a subterfuge to pay kickbacks and gratuities to physicians for prescribing Neurontin, particularly for off-label uses. The Speakers Bureau sponsored teleconferences, dinner meetings, consultants meetings, educational seminars, and other events where the off-label uses of Neurontin were marketed. The speakers at these events were physicians who gave short presentations relating to Neurontin for which they were paid by Defendants anywhere from $250 to $3,000 per event. Many speakers received tens of thousands of dollars annually in exchange for recommending to fellow physicians that Neurontin be prescribed, particularly for off-label uses. The payments were far in excess of the fair value of the work the physicians performed for Defendants. Plaintiff believes that extensive payments through the Speakers Bureau took place at least from 1995 through 2000.

60. Defendants' marketing personnel, including its medical liaison staff, informed physicians of the lucrative rewards of joining the Neurontin Speakers Bureau. Physicians were informed that if they prescribed enough Neurontin, they, too, could be eligible for receiving substantial payments just for describing their clinical experience to peers at events dedicated to promoting Neurontin's off-label uses. Defendants' marketing personnel, however, made it clear that the only way the doctors could receive such cash payments was if they prescribed substantial amounts of Neurontin to their patients, preferably for off-label uses.

61. Defendants were aware that these payments did not comply with the American Medical Association's guidelines for payments to physicians. They knew and intended that the payments were made for the express purpose of encouraging the physicians to prescribe Neurontin to their patients.

62. In 1997, in the wake of an investigation by the FDA, Defendants conducted a review of their marketing practices in light of existing federal kickback prohibitions. As a result of that review, Defendants determined that none of the programs described above should have been conducted in the manner previously conducted by Defendants. Defendants issued guidelines which essentially prohibited each of the programs described above. Nonetheless, Defendants' payments to physicians for the off-label marketing of Neurontin did not cease and the programs continued until at least 1998. Because Defendants' records demonstrate payments of inappropriate kickbacks and incentives to doctors through 1998, Plaintiff believes that such payments continued through the merger of Parke-Davis' parent, Warner-Lambert, with Defendant Pfizer, or perhaps even through the calling of a grand jury regarding Parke-Davis' marketing practices relating to Neurontin.

## VI. THE ROLE OF NON-PHYSICIAN TECHNICAL WRITERS, PHYSICIANS AND VENDORS IN DEFENDANTS' MARKETING SCHEME

63. The non-physician technical writers, physician "authors," and vendors, namely AMM/Adelphie Ltd. ("AMM") and Medical Educational Systems, Inc. ("MES"), (collectively referred to herein as the "Promotional Strategists") were key parties in Defendants' improper marketing and sales scheme, as they were the parties who knowingly and willfully facilitated, communicated and distributed the misrepresentations concerning the use of Neurontin for off-

26

label uses. The non-physician technical writers wrote articles based on inaccurate – and in some cases no – scientific evidence concerning the safety and efficacy of Neurontin to treat off-label symptoms. The physicians lent their names as "authors" to such articles, misrepresenting the authorship and objectivity of such articles. And, AMM and MES (hereinafter "Vendors") caused these articles to be published in a variety of medical journals across the country. In addition, the physicians who performed and participated in sham "studies" regarding the safety and efficacy of Neurontin for off-label uses were key parties to Defendants' scheme as these physicians knowingly misrepresented facts and evidence concerning Neurontin's off-label uses.

64. The Promotional Strategists were active participants in Defendants' scheme and were aware of, and interacted with, other participants in the fraudulent scheme.

65. The Promotional Strategists operated collectively, for a common purpose and as a continuing unit to perpetrate the fraudulent scheme relating to Neurontin.

66. The Promotional Strategists' collective knowledge, involvement and activity is evidenced by:

(a) The failure of the Promotional Strategists to advise government regulators (including Medicaid), private insurers and patients, including Plaintiff, of the existence and spread of such misinformation concerning off-label uses of Neurontin;

(b) The acceptance by the Promotional Strategists of various types of incentives from Defendants in return for their agreement to write, author and have published articles containing misrepresentations knowing that other physicians and third-party payors would rely on such information; and

(c) The agreement of the Promotional Strategists to permit Defendants to

27

control the information relayed to the public in such articles.

## VII. DEFENDANTS' MOTIVE

67.  Defendants' motive in creating and operating the fraudulent scheme and RICO Enterprises described herein was to fraudulently obtain additional sales and revenues from Neurontin.

68.  The fraudulent scheme was designed to, and did, cause Plaintiff to pay claims for Neurontin to treat conditions for which the drug is not medically necessary. The fraudulent scheme also caused Plaintiff to pay claims for Neurontin to treat non-FDA approved conditions. In the absence of Defendants' improper conduct, Plaintiff would not have paid for such Neurontin claims.

## VIII. USE OF THE MAILS AND WIRES

69.  Since at least 1994, Defendants used thousands of mail and interstate wire communications to create and manage their fraudulent scheme. Defendants' scheme involved national marketing and sales plans and programs, and encompassed physicians and victims across the country.

70.  Defendants' use of the mails and wires to perpetrate their fraud involved thousands of communications, including:

   (a)  Marketing and advertising materials about the off-label uses of Neurontin for which the drug is not safe and medically efficacious, such materials being sent to doctors across the country;

   (b)  Communications, including financial payments, with the Vendors, non-physician technical writers, and physician "authors" discussing and relating to the publication of

articles touting off-label uses of Neurontin for which the drug is not safe and medically efficacious, as detailed above;

(c)     Communications with the Vendors, doctors and private insurers that fraudulently represented that Neurontin was scientifically proven to be safe and effective for off-label uses;

(d)     Communications with health insurers and patients, including Plaintiff, inducing payments for Neurontin to be made in reliance on misrepresentations concerning the use of Neurontin for non-medically necessary uses; and

(e)     Receiving the proceeds of the Defendants' improper scheme.

71.     In addition, Defendants' corporate headquarters have communicated by United States mail and by facsimile with various local district managers, medical liaisons and pharmaceutical representatives in furtherance of Defendants' schemes.

## TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

72.     Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiff has been kept in ignorance of vital information essential to the pursuit of these claims, without any fault or lack of diligence on its part. Plaintiff could not reasonably have discovered the fraudulent nature of Defendants' conduct. Accordingly, Defendants are estopped from relying on any statute of limitations.

## COUNT ONE
### Violation of 18 U.S.C. § 1962(c)
### (The MES Enterprise)

73. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

74. Defendants are the "persons" within the meaning of § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

75. MES is an "enterprise" which was created and/or used as a tool to effectuate Defendants' pattern racketeering activity. The Defendant "persons" are distinct from MES as the enterprise.

76. The MES Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased or provided Neurontin to thousands of individuals throughout the United States.

77. Defendants have exerted control over the MES Enterprise, and Defendants have participated in the operation or management of the affairs of the MES Enterprise, through the following actions:

(a) Defendants have asserted direct control over the information and content disseminated to the Vendors (including MES), doctors and the public regarding the medical safety and efficacy of Neurontin for off-label uses in articles published across the country;

(b) Defendants have asserted direct control over the creation and distribution of mass-marketing and sales materials sent to Vendors and doctors throughout the United States; and

(c) Defendants have placed their own employees and agents in positions of authority and control in the MES Enterprise.

78. Defendants have conducted and participated in the affairs of the MES Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), as described above.

79. In implementing their fraudulent scheme, Defendants were acutely aware that Plaintiff and other healthcare providers depend on the honesty of Defendants in representing the safety and medical efficacy of Neurontin's uses.

80. As detailed above, Defendants' fraudulent scheme consisted of, *inter alia*: (a) causing providers to misrepresent the off-label use(s) for which Neurontin was being prescribed so that Plaintiff was unaware that contrary to its plan language it was paying Neurontin claims for off-label uses; (b) deliberately misrepresenting the uses for which Neurontin was safe and effective so that Plaintiff paid for this drug to treat symptoms for which it was not scientifically proven to be safe and effective; (c) publishing or causing to have published materials containing false information upon which physicians, Plaintiff and other healthcare providers relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses for which the drug is not scientifically proven to be safe or medically efficacious; and (d) actively concealing, and causing others to conceal, information about the true safety and efficacy of Neurontin to treat conditions for which it had not been approved by the FDA.

81. Defendants' scheme was calculated to ensure that Plaintiff would pay claims for Neurontin to treat a wide variety of uses which Defendants knew were not necessarily treatable with Neurontin.

82. Each of Defendants' fraudulent mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

83. Defendants engaged in a pattern of racketeering activity intending to defraud Plaintiff.

84. The above described racketeering activities amounted to a common course of conduct intended to deceive Plaintiff. Defendants' criminal acts of racketeering had the same pattern and similar purpose of defrauding Plaintiff. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff. Defendants' fraudulent activities are part of their regular way of conducting their ongoing business and constitute a continuing threat to the property of Plaintiff.

85. The pattern of racketeering activity alleged herein and the MES Enterprise are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the MES Enterprise.

86. Plaintiff has been injured in its property by reason of these violations in that it has made millions of dollars in overpayments for Neurontin.

87. Plaintiff relied, to its detriment, on Defendants' fraudulent misrepresentations and omissions.

88. Plaintiff's injuries were directly and proximately caused by Defendants' racketeering activity as described above.

89. By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT TWO
### Violation of 18 U.S.C. § 1962(c)
### (The AMM Enterprise)

90. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

91. Defendants are the "persons" within the meaning of § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

92. AMM is an "enterprise" which was created and/or used as a tool to effectuate Defendants' pattern racketeering activity. The Defendant "persons" are distinct from AMM as the enterprise.

93. The AMM Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased or provided Neurontin to thousands of individuals throughout the United States.

94. Defendants have exerted control over the AMM Enterprise, and Defendants have participated in the operation or management of the affairs of the AMM Enterprise, through the following actions:

(a) Defendants have asserted direct control over the information and content disseminated to the Vendors (including AMM), doctors and the public regarding the medical safety and efficacy of Neurontin for off-label uses in articles published across the country;

(b) Defendants have asserted direct control over the creation and distribution of mass-marketing and sales materials sent to Vendors and doctors throughout the United States; and

(c) Defendants have placed their own employees and agents in positions of authority and control in the AMM Enterprise.

95. Defendants have conducted and participated in the affairs of the AMM Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), as described above.

96. In implementing their fraudulent scheme, Defendants were acutely aware that Plaintiff and other healthcare providers depend on the honesty of Defendants in representing the safety and medical efficacy of Neurontin's uses.

97. As detailed above, Defendants' fraudulent scheme consisted of, *inter alia*: (a) causing providers to misrepresent the off-label use(s) for which Neurontin was being prescribed so that Plaintiff was unaware that contrary to its plan language it was paying Neurontin claims for off-label uses; (b) deliberately misrepresenting the uses for which Neurontin was safe and effective so that Plaintiff paid for this drug to treat symptoms for which it was not scientifically proven to be safe and effective; (c) publishing or causing to have published materials containing false information upon which physicians, Plaintiff and other healthcare providers relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses for which the drug is not scientifically proven to be safe or medically efficacious; and (d) actively concealing, and causing others to conceal, information about the true safety and efficacy of Neurontin to treat conditions for which it had not been approved by the FDA.

34

...

98.  Defendants' scheme was calculated to ensure that Plaintiff would pay claims for Neurontin to treat a wide variety of uses which Defendants knew were not necessarily treatable with Neurontin.

99.  Each of Defendants' fraudulent mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

100.  Defendants engaged in a pattern of racketeering activity intending to defraud Plaintiff.

101.  The above described racketeering activities amounted to a common course of conduct intended to deceive Plaintiff. Defendants' criminal acts of racketeering had the same pattern and similar purpose of defrauding Plaintiff. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff. Defendants' fraudulent activities are part of their regular way of conducting their ongoing business and constitute a continuing threat to the property of Plaintiff.

102.  The pattern of racketeering activity alleged herein and the AMM Enterprise are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the AMM Enterprise.

103.  Plaintiff has been injured in its property by reason of these violations in that Plaintiff has made millions of dollars in overpayments for Neurontin.

104.  Plaintiff relied, to its detriment, on Defendants' fraudulent misrepresentations and

98.  Defendants' scheme was calculated to ensure that Plaintiff would pay claims for Neurontin to treat a wide variety of uses which Defendants knew were not necessarily treatable with Neurontin.

99.  Each of Defendants' fraudulent mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

100.  Defendants engaged in a pattern of racketeering activity intending to defraud Plaintiff.

101.  The above described racketeering activities amounted to a common course of conduct intended to deceive Plaintiff. Defendants' criminal acts of racketeering had the same pattern and similar purpose of defrauding Plaintiff. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff. Defendants' fraudulent activities are part of their regular way of conducting their ongoing business and constitute a continuing threat to the property of Plaintiff.

102.  The pattern of racketeering activity alleged herein and the AMM Enterprise are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the AMM Enterprise.

103.  Plaintiff has been injured in its property by reason of these violations in that Plaintiff has made millions of dollars in overpayments for Neurontin.

104.  Plaintiff relied, to its detriment, on Defendants' fraudulent misrepresentations and

omissions.

105. Plaintiff's injuries were directly and proximately caused by Defendants' racketeering activity as described above.

106. By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT THREE
### Violation of 18 U.S.C. § 1962(c)
### (The Promotion Strategist Enterprise)

107. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

108. Defendants are the "persons" within the meaning of § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

109. The enterprise is an association in fact within the meaning of § 1961(4) consisting of each of the three Defendants, Pfizer, Warner-Lambert and Parke-Davis, including their employees and agents, and the non-physician technical writers, physician "authors," and Vendors located throughout the United States who participated in the fraudulent schemes described above (the "Promotional Strategist Enterprise"). The Promotional Strategist Enterprise is an ongoing organization and functions as a continuing unit. The Promotional Strategist Enterprise was created and/or used as a tool to effectuate Defendants' pattern of racketeering activity. The Defendant "persons" are distinct from the Promotional Strategist Enterprise.

110. The Promotional Strategist Enterprise falls within the meaning of 18 U.S.C. §

1961(4), and consists of a group of "persons" associated together for the common purposes of marketing and selling Neurontin to Plaintiff and earning profits therefrom.

111. The Promotional Strategist Enterprise engaged in and affected interstate commerce, because, *inter alia*, it marketed, sold, purchased or provided Neurontin to thousands of individuals throughout the United States.

112. Each Defendant has exerted control over the Promotional Strategist Enterprise, and each has participated in the operation or management of the affairs of the Promotional Strategist Enterprise, through the following actions:

(a) Defendants have asserted direct control over the information and content disseminated to doctors and the public regarding the medical safety and efficacy of Neurontin for off-label uses in articles published across the country;

(b) Defendants have asserted direct control over the creation and distribution of mass-marketing and sales materials sent to doctors throughout the United States; and

(c) Defendants have placed their own employees and agents in positions of authority and control in the Promotional Strategist Enterprise.

113. Defendants have conducted and participated in the affairs of the Promotional Strategist Enterprise through a pattern of racketeering activity that includes acts indictable under 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud), as described above.

114. In implementing their fraudulent scheme, Defendants were acutely aware that Plaintiff and other healthcare providers depend on the honesty of Defendants in representing the safety and efficacy of Neurontin's uses.

115. As detailed above, Defendants' fraudulent scheme consisted of, *inter alia*: (a)

causing providers to misrepresent the off-label use(s) for which Neurontin was being prescribed so that Plaintiff was unaware that contrary to its plan language it was paying Neurontin claims for off-label uses; (b) deliberately misrepresenting the uses for which Neurontin was safe and effective so that Plaintiff paid for this drug to treat symptoms for which it was not scientifically proven to be safe and effective; (c) publishing or causing to have published materials containing false information upon which physicians, Plaintiff and other healthcare providers relied upon when choosing to prescribe or pay for Neurontin to treat off-label uses for which the drug is not scientifically proven to be safe or medically efficacious; and (d) actively concealing, and causing others to conceal, information about the true safety and efficacy of Neurontin to treat conditions for which it had not been approved by the FDA.

116.    Defendants' scheme was calculated to ensure that Plaintiff would pay claims for Neurontin to treat a wide variety of uses which Defendants knew were not necessarily treatable with Neurontin.

117.    Each of Defendants' fraudulent mailings and interstate wire transmissions constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1). Collectively, these violations constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

118.    Defendants engaged in a pattern of racketeering activity intending to defraud Plaintiff.

119.    The above described racketeering activities amounted to a common course of conduct intended to deceive Plaintiff. Defendants' criminal acts of racketeering had the same pattern and similar purpose of defrauding Plaintiff. Each such racketeering activity was related,

38

had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiff. Defendants' fraudulent activities are part of their regular way of conducting their ongoing business and constitute a continuing threat to the property of Plaintiff.

120.  The pattern of racketeering activity alleged herein and the Promotional Strategist Enterprise are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the Promotional Strategist Enterprise.

121.  Plaintiff has been injured in its property by reason of these violations in that Plaintiff has made millions of dollars in overpayments for Neurontin.

122.  Plaintiff relied, to its detriment, on Defendants' fraudulent misrepresentations and omissions.

123.  Plaintiff's injuries were directly and proximately caused by Defendants' racketeering activity as described above.

124.  By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are jointly and severally liable to Plaintiff for three times the damages Plaintiff has sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT FOUR
**Violations of 18 U.S.C. § 1962(d) by Conspiring to Violate 18 U.S.C. § 1962(c)**

125.  Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

126.  Section 1962(d) of the RICO statute provides that it "shall be unlawful for any

person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

127.  Defendants have violated § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) Enterprises described above through a pattern of racketeering activity.

128.  As detailed above, Defendants' co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including material misrepresentations and omissions designed to defraud Plaintiff.

129.  The nature of the above described Defendants' co-conspirators' acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but they were aware that their ongoing fraudulent and extortionate acts have been and are part of an overall pattern of racketeering activity.

130.  As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiff has been and is continuing to be injured in its business or property as set forth more fully above.

131.  Defendants have sought to and have engaged in the commission of overt acts, including the following unlawful racketeering predicate acts:

    (a)  Multiple instances of mail and wire fraud violations of 18 U.S.C. §§ 1341 and 1342;

    (b)  Multiple instances of mail fraud violations of 18 U.S.C. §§ 1341 and